UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

DR. BONAGH DALTON,                              Civ. No. 10-854 (RHK/LIB)

        Plaintiff,

v.                                              **REPORT AND**
                                                **RECOMMENDATION**

REGENTS OF THE UNIVERSITY
OF MINNESOTA, and CENTRACARE
HEALTH SYSTEM,

        Defendants.

_____

This matter is before the Court upon Defendants' Motion for Summary Judgment or alternatively, for Default Judgment, which has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. Also before the Court is Plaintiff's motion for an extension of time to complete discovery. A hearing on the motions was conducted on June 9, 2011, at which time Plaintiff appeared by Philip Villaume, Esq., and Defendants appeared by Brent Benrud, Esq. For the reasons set forth below, it is recommended that Defendants' Motion be granted and that Plaintiff's motion be denied.

## I.    BACKGROUND

Plaintiff Bonagh Dalton, a former employee of Defendants Regents of the University of Minnesota ("the University") and CentraCare Health System ("Centracare"), brings this action under Title VI of the Civil Rights Act, 42 U.S.C. §2000d et seq.; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et. seq.; 42 U.S.C. § 1981; 42 U.S.C. § 1983; and the Minnesota Human Rights Act, Minn.Stat. § 363A.08 et seq. Dalton alleges that Defendants discriminated against

1

her based upon race and national origin and that they retaliated against her for reporting unlawful discrimination.   Defendants now move for summary judgment, and alternatively, they seek dismissal of Dalton's claims as a sanction for her failure to respond to written discovery and to appear for her deposition.

### A.       The St. Cloud Residency Program

Dalton is originally from India, where she attended medical school and practiced medicine until 2001, when she married an American citizen and moved to the United States. (Dalton Aff., Dkt. 47, at ¶ 7).   After her arrival in the United States, Dalton sought to be certified to practice medicine in the United States, and to that end, she applied for and was accepted to the University's St. Cloud Family Medicine Residency Program (the St. Cloud Residency Program). (Id. at ¶ 8).   She participated in this residency program from June 2007 to June 2008.   (Blonski Aff., Dkt. 37, at ¶s 3-4).   The St. Cloud Residency Program is based in the St. Cloud Hospital in St. Cloud, Minnesota, which is owned and operated by CentraCare.   Dalton was one of five residents who began the program in June 2007.   (Id. at ¶ 5).[1]

According to Dr. Joseph Blonski, who is the Program Director for the St. Cloud Residency Program, there were two ongoing issues during Dalton's residency: first, there were ongoing problems with her performance, and second, there were ongoing interpersonal conflicts among the five first-year residents.   (Id. at ¶s 7-8).   Blonski asserts that Dalton's performance issues arose soon after she began the program and continued throughout.   (Id. at ¶ 8).   These

---

[1]  The St. Cloud Residency Program has accepted a large number of international medical school graduates (IMGs) over the years of its operation.   (Blonski Aff., at ¶ 6; Exh. A).   Of the 51 residents who have participated in the program, 22 graduated from international medical schools. One other resident in Dalton's class was also Asian and a graduate of an Indian medical school. The three remaining residents were white graduates of domestic medical schools.

performance issues included failure to timely complete duty hour reports, duty hour violations, failure to inform hospital staff of her whereabouts, defensiveness, difficulty accepting coaching and constructive criticism, lack of reliability and dependability, lack of attention to detail, difficulty with communication, and lack of interpersonal skills.[2]  Dalton was "coached regarding these problems on a number of occasions, both orally and in writing."  (Id.)

According to Blonski, he began receiving complaints about interpersonal conflicts among the first year residents in the fall of 2007.  (Id. at ¶ 12).  Dalton complained about two of the white/American residents, and in turn, they complained about Dalton.  The complaints generally involved failure to communicate, failure to cooperate, perceived slights, and rude or unprofessional behavior.  Accordingly, in December 2007, Dr. Blonski held "the first of several meetings with the first-year residents to address these concerns."  (Id. at ¶ 13).  The meeting discussions focused on the importance of teamwork in patient care and differences in learning, communication, and work styles among the residents.

According to Dalton, in January 2008, the St. Cloud Residency Program conducted an annual program review, in which the residents provided anonymous feedback for the residency program.  (Dalton Aff., at ¶ 18).  Some of the anonymous comments included allegations that international medical school graduates (IMGs) were being treated differently than the American-educated residents and statements about duty hour violations.  (Id. at ¶ 20).  Dalton states that Blonski talked to her about the complaints of discrimination she had apparently made in the

---

[2] The Accreditation Council for Graduate Medical Education (ACGME) places strict rules on the number of hours residents may spend on duty.  Programs that violate the duty hour rules risk loss of their accreditation.  To insure compliance with the rules, the University's residency programs have developed a system for tracking resident duty hours.  According to Blonski, on certain occasions Dalton failed to properly complete the duty hour reports and worked more hours than permitted by ACGME rules.

program review before the review was distributed.  (Id. at ¶ 19).  She further states that Blonski "threatened" her at this time.  (Id. at ¶ 19).  She does not explain what Blonski said or what he did to threaten her.  Dalton states that Dr. Chris Wenner, a faculty member, scolded her for making remarks regarding duty hour violations in the annual review.  (Id. at ¶ 22).  Dalton responded by saying that the IMGs were not treated the same and that she "cannot function in this way." (Id. at ¶ 23).  Wenner is alleged to have replied, "Oh you want to leave the program? When do you want to leave?" (Id. at ¶24).

One of the first year resident meetings established by Blonski was held on February 27, 2008.  (Blonski Aff., at Exh. D).  Following the meeting, Blonski sent an email to Dalton thanking her for her participation in the meeting, stating "[a]lthough there are significant hurdles yet to climb, I believe the meeting today opened up the door for further conversation to work through the issues." (Id.)  In response, Dalton informed Blonski that she believed IMGs were being treated differently than white/American-born residents, stating that she perceived "an intense hatred for foreign graduates" within the program. (Id.)  Dalton advised Blonski that she had concerns about staying in this "very hostile environment" for the full three years, and further stated that if things did not improve she would rather find a different program for the next year.

In his response, Blonski stated: "[i]t sounds as if there are some things that have been going on since early in your residency that you are perceiving to be secondary to IMG discrimination."  Blonski asked Dalton to compile a list of specific actions that she perceived as discriminatory so that they could discuss her complaint further.  After reviewing the list that Dalton submitted, Blonski contacted Dr. Joe Brocato, who is the Director of Graduate Medical Education for the Department of Family Medicine at the University.  (Id. at ¶ 15).  Brocato agreed to bring a team from the University in order investigate Dalton's complaint.

4

Blonski met with Dalton on April 1, 2008, to inform her that a team would be coming to investigate the concerns that she had raised regarding the treatment of IMGs.  (Id. at ¶ 16).  At that time, Blonski provided Dalton with a copy of the program's grievance policy and informed her that she could also bring her concerns to the attention of the Institutional Ombudsman or the St. Cloud Hospital Graduate Medical Education Committee.  (Id.)  There is no evidence that Dalton attempted to raise her dispute with anyone else during her time in the St. Cloud Residency Program.

The investigation, which occurred on April 8, 2008, was conducted by Dr. Brocato, Shailendra Prasad, M.D., and Karla Hemesath, Ph.D.[3]  (Id. at ¶ 17).  The team met individually with each of the first year residents and discussed the matter with program faculty and staff.

On April 24, 2008, Dalton emailed Brocato regarding the onsite investigation.  (Blonski Aff., Exh. E).  As relevant here, Dalton states:

> "I first of all wanted to let the team know that I did not initiate the investigation.  I had actually asked the Program director to sort it out within the program. . . . I did not claim any racial discrimination but the issues were basically behavioral issues and cliché and contempt issues with just 3 residents in my PGY-1 class, which were stressful for me in the program."

In her email, Dalton went on to raise a number of complaints regarding her problems with other residents.[4]

---

[3]   Dr. Prasad, who is also Asian and a graduate of an Indian medical school, is an Assistant Professor in the Department of Family Medicine.  Dr. Hemesath is the Education Director for the University's Graduate Medical Education Program.

[4]   In particular, Dalton claimed that some of her colleagues yelled at her, were disrespectful, made fun of her, and engaged in unprofessional conduct while on duty.  She also stated that she did not get an equal opportunity to schedule vacation and required coursework, and that she was

On April 28, 2008, the team issued a memorandum outlining their findings regarding the overall climate of the residency program.  (Blonski Aff., Exh. F).  Based on their investigation, the team made the following findings:

> 1.      that there were "very strong personality types in both the domestic and IMG members," which was causing conflict;
>
> 2.      that the interns varied in their level of practical clinical experience and their familiarity with the U.S. healthcare system: the IMGs had more applied clinical experience while the domestically trained interns had greater familiarity with the U.S. healthcare system;
>
> 3.      that issues of lack of professionalism and lack of teamwork pervaded the intern class.  The team noted that the interns were not uniformly handing patient handoffs, they were not uniformly participating in hospital rounds or answering their pagers, and they were not uniformly assisting their colleagues when requested;
>
> 4.      that there was "no evidence of overt discrimination," but the class was not "fully respectful of each other's needs as professionals or individuals," which was primarily caused by "personality clashes within the group";
>
> 5.      that the written code of professionalism was neither strictly adhered to by the intern class nor routinely enforced by the program faculty.

The team also made recommendations for addressing some of the problems they had identified during their investigation, including training opportunities, the development of an enhanced policy for professionalism, and the development of a system for ensuring fairness in scheduling of call shifts.[5]

Dalton states that, after the site investigation, Wenner wrote in a performance evaluation that she was "disorganized," even though he had previously described her as "well organized."

_____

not given an equal scheduling of shifts.  She also raised a number of concerns regarding the management of the program and patient care.

[5] A "call" is when a resident is required to stay in the hospital overnight attending to existing patients and admitting new patients.  (Dalton Decl., at ¶ 13).

(Dalton Aff., at ¶ 31).  Dalton also states that after Brocato's investigation, Wenner frequently told her that she "used the big word, 'discrimination.'"  (Id.)  Dalton further states that Blonski told her not to talk to the emergency room doctors or the vice president of the hospital about her complaint.

In May 2008, Dr. Blonski decided to place Dalton on a "learning plan" because of the ongoing concerns regarding her performance as a resident.  (Blonski Aff., at ¶ 9).  Accoding to Blonski, a learning plan is a remedial plan designed to identify areas of concern and to assist residents in improving their performance.  Dr. Blonski prepared a written memorandum stating his reasons for placing Dalton on a learning plan and setting forth the goals and objectives for improving her performance, which was provided to Dalton on May 14, 2008.  (Id., at Exh. B).  Blonski stated that Dalton had deficits in her communication and interpersonal skills, which was evidenced by her inability to accept feedback, her inability to effectively communicate problems to faculty, frequent interruptions of staff, poor communication with colleagues, and a lack of willingness to address interpersonal conflicts within her own control.  Second, Blonski stated that Dalton had difficulty in "working through challenging issues in a professional manner," which was evidenced by her inability to move on from problems early in the residency year, her practice of taking her concerns and complaints outside the program faculty and chain of command, and her failure to address problems and concerns in a constructive and positive manner.  According to Dalton, when Blonski gave her the learning plan, he allegedly told her that he was not willing to promote her to the next level of her residency, stating, "[y]ou don't know who you are talking to; I am in a lot of Committees and my expectation is that you do not return to St. Cloud Hospital; and I will not let you graduate."  (Dalton Aff., at ¶s 37, 40).  According to Dalton, about one hour after she received the learning plan from Blonski, she had

an interview for another residency program that she was interested in transferring to – namely, the Pediatrics Residency Program based at the University's Twin Cities campus.  (Id, at ¶ 36).

According to Blonski, he submitted the learning plan to the Department of Family Medicine's Scholastic Standing Committee (SSC) for review at its May 22, 2008 meeting in accordance with program policy.[6]  (Blonski Aff., at ¶ 11).  After reviewing Dalton's performance reviews and evaluations, and the concerns and complaints that had been received regarding Dalton, the SSC made the decision to formally place her on academic probation.  Dalton states that Defendants did not follow the proper procedure set forth in the University's grievance procedures.  (Dalton Aff., at ¶ 39).  Dalton has not provided the Court with the University's grievance procedures, nor has she explained what procedures the University violated or how the procedures in question were violated.

According to Blonski, however, before the SSC had implemented its decision to place Dalton on academic probation, she gave notice of her intent to resign from the St. Cloud Residency Program and to enroll in the University's Pediatrics Residency Program, which is based on the Twin Cities campus.  (Blonski Aff., at ¶ 11).  Accordingly, on June 5, 2008, in lieu of placing her on academic probation, the SSC decided to accept her resignation.  (Id. at Exh. C).

Dalton alleges that the University "forced" her to resign as a result of Blonski's comments, and that she had to "scramble" to find another residency position as a result.  (Dalton Aff., at ¶ 40-42).  She also claims that on May 30, 2008, Blonski produced an already-typed resignation letter for her to sign. (Id. at ¶ 48).

---

[6]  The SSC is maintained by the Department of Family Medicine "to review the performance of medical residents and fellows in the University's eight family medicine residence/fellowship programs."

The University's Pediatrics Residency Program orientation began two weeks before the St. Cloud Residency Program ended.  Under University and ACGME rules, a resident may not participate in two different residency programs at the same time.   (Blonski Aff., at ¶ 21). Consequently, Dalton was advised that she would have to decide whether to complete the final two weeks of the St. Cloud Residency Program and start the Pediatrics Residency Program two weeks late, or she would have to miss the final two weeks of the St. Cloud Residency program and start the Pediatrics Residency Program on time.  She was also advised that she would not receive credit in the St. Cloud Residency Program for the two weeks not completed if she chose to leave early.

Around this time, Dalton and Blonski exchanged some emails regarding the decisions she needed to make regarding her resignation from the program.  In an email dated June 2, 2008, Dalton asked Blonski for a copy of her contract so she could go over it before she submitted a letter of resignation.  (Id. at Exh. G).  Dalton also stated that "since the residency is requesting my resignation I would like to have the request for my resignation in writing from the program."

In response, Blonski informed her that she could go over her contract that day if she desired, and went on to state:

> "[Your contract] discusses your commitment here until June 30, 2008.   Let me be clear, the program is not asking for your resignation.  However, if you expect to leave the program prior to June 30th then I will need a resignation so that the appropriate paperwork can be completed.   We will allow you (as opposed to ask you) to resign on June 15th so that your benefits, etc. will not expire and so that you can start orientation at the U of M on June 16th . . . . The program's other option would be to hold you to your current contract which expires June 30th.  You would be expected to fulfill you residency obligations until then (including call and clinic).   You would not be available to attend the U of M orientation or start your U of M rotations on time. I need you to

give us an answer in writing as to your intentions.  If you leave
early it creates all kinds of challenges for the program (cancelling
clinic, call changes, etc.).  This is why I need something in writing
ASAP if you decide to resign early.  Otherwise let me know if you
plan to stay through June 30th so that we don't need to cancel
clinics, etc.  There are no tricks here Bonagh.  I'm trying to be fair
and reasonable by allowing you to leave early if that is your desire.
This is the only way I see that this can be done.  Currently you
have not signed a contract with us for next year.  My expectation is
that you will not be returning to St. Cloud as a second year resident
due to transfer to the Pediatric residency at the U of M.  If that is
not your intention, I need you to sign a contract ASAP."

Dalton responded, stating that her preference was to fulfill her commitment to the St. Cloud

residency program before starting the pediatrics program.  Blonski advised Dalton that "you need

to decide for yourself," but he also advised her that he believed missing orientation might get her

off on the wrong foot in her new residency program.

Dr. John Andrews, who is the Program Director for the Pediatrics Residency Program,

advised Dalton that he thought starting the pediatrics program on time "would be the best way

for you to feel integrated with the incoming intern class and ensure good communication with

your peers going forward."  On June 2, 2008, Dalton wrote to Blonski regarding her decision,

stating, "I think the decision is clear for me.  I would be starting the orientation on the 16th."

In her affidavit, Dalton claims that Blonski "insisted" that she resign from the program

effective June 16, 2008, once he learned that the orientation for the Pediatrics Residency

Program started before the St. Cloud Residency Program ended.  (Dalton Aff., at ¶ 45).  She also

states that Blonski attempted to influence the pediatrics program in order to get her to start that

program on June 16, 2008.  (Id. at ¶ 49).  Dalton asserts that Blonski had communicated

"substantial false and negative information" regarding her claims of discrimination to faculty and

management of the Pediatrics Residency Program by June 16, 2008.  (Id. at ¶ 55).  Again, she

does <u>not</u> explain what the false information he conveyed, or who specifically he communicated this information to.

According to Blonski, the other IMG in Dalton's residency class, who was also Asian, "was highly successfully, eventually serving as Chief Resident."  (Blonski Aff., at ¶ 24). Blonski also states that "[a]ll of the residents in the program received equally-distributed 'on call' assignments" and equal consideration in the scheduling of vacation."  (<u>Id.</u> at ¶ 25).

Andrews and Blonski spoke on a few occasions before Dalton started the Pediatrics Residency Program in order "to facilitate Dr. Dalton's transfer."  (<u>Id.</u> at ¶ 23).  However, after Dalton left the program on or about June 15, 2008, Blonski had no further contact with Andrews or anyone else in the Pediatrics Residency Program regarding Dalton.  (<u>Id.</u>)

In her affidavit, Dalton alleges that she and Dr. Punam Patil, who was the other IMG in the St. Cloud Residency Program, were denied vacation requests while the other three white, American-born residents' vacation requests were granted.  (Dalton Aff., at ¶ 12).  In contrast to Blonski's assertion, Dalton states that she was assigned approximately four to five more call shifts than the white/American-born residents.  (<u>Id.</u> at ¶ 13).  Dalton also states that she "was compelled to incur duty hour violations" because her white/American-born colleagues refused to change call shifts with her.  (<u>Id.</u> at ¶s 14-15).  Lastly, she states that some of the white/American-born residents were not always required to come to morning rounds even though Dalton and Patil were always required to come to morning rounds.  (<u>Id.</u> at ¶ 13).

**B.     The Pediatrics Residency Program**

According to Andrews, Dalton was one of 24 residents who started the Pediatrics Residency Program on June 16, 2008.  (Andrews Aff., Dkt. 36, at ¶ 4).

Dalton states that she was treated differently than another resident in the pediatrics program (identified only as "Kelly"), who was permitted to skip the orientation and complete her full year of residency in neurosurgery before transferring to the pediatrics program.   (Dalton Aff., at ¶ 56).

According to Dalton, Dr. Dawn Martin, who was assigned to be Dalton's preceptor in the Pediatrics Residency Program, asked her how she got into the program and why she left the St. Cloud Program.  (Id. at ¶ 55).[7]   Dalton claims that Martin was intimidating and hostile towards Dalton.  (Id. at ¶ 60).  She does not explain how Martin was hostile or intimidating, but she complained about Martin to program faculty and asked that she be assigned to a new preceptor. Although Dalton first lodged her request in August, she was not assigned to a new preceptor until December 3, 2008.  (Id. at ¶ 63).  Dalton maintains that her request for a new preceptor was treated less favorably than a white/American resident, who was "promptly" granted a request for a new preceptor.  (Id. at ¶ 62).

According to Andrews, soon after the program commenced, he "began receiving complaints and concerns regarding Dalton."   (Andrews Aff., at p 6).   The complaints and concerns came from a variety of persons, including program faculty and hospital staff, and they involved Dalton's "medical knowledge, organization, documentation, communication, professionalism, and interpersonal skills."   In addition, complaints arose regarding Dalton's completion of duty hour reports.  Andrews and other faculty met with Dalton to discuss these complaints on several occasions.

---

[7] According to Dalton, a preceptor is a resident's supervisor, advisor, and advocate, and all residents are required to work a half-day each week with their preceptor.

The University's Department of Pediatrics maintains a Resident Review Committee (RRC) "to review the performance of medical residents in the University's Pediatrics Residency Program." (Id. at ¶ 7). The RRC first discussed the complaints and concerns regarding Dalton's performance at the September 3, 2008 meeting. (Id. at ¶ 8). The RRC concluded that Dalton was not meeting the expectations of a first-year resident. On September 5, 2008, Andrews met with Dalton to discuss the RRC's concerns and to establish expectations for improving her performance. (Id. at ¶ 9).

The RRC again discussed Dalton's performance at the November 5, 2008 meeting. (Id. at ¶ 10). The RRC noted that they continued "to receive complaints and concerns regarding her performance." Consequently, the RRC decided to monitor Dalton's performance on a monthly basis. On November 13, 2008, Andrews again met with Dalton as requested by the RRC, and they discussed the RRC's concerns and expectations. (Id. at ¶ 11). Andrews advised Dalton that she could be placed on academic probation if her performance did not improve.

On December 3, 2008, the RRC reviewed new complaints regarding Dr. Dalton's performance. Based upon the reports, the RRC voted to place Dr. Dalton on academic probation. (Id. at ¶ 12). This was communicated to Dr. Dalton by letter dated December 18, 2008:

> "During your rotations in Primary Care Fundamentals and, subsequently, General Pediatrics at Hennepin County Medical Center (HCMC), several attending physicians expressed concerns about whether you were making satisfactory progress in the residency training program. Everyone comments that you are a very pleasant person who is extremely sensitive to the needs of patients and their families. However, faculty raised concerns about your lack of organization, the quality of your presentations of histories and physical examinations, and your development of rudimentary assessments and management plans. You were perceived to have difficulty synthesizing and prioritizing information. In addition, you struggled with the electronic medical

> record system.  Several faculty members commented that there
> were major gaps in your medical knowledge.  After much
> discussion, the RRC concluded that you were not meeting
> standards for a first year pediatric resident."

(Id. at Exh. B).  The letter discussed specific concerns and complaints underlying the RRC's

decision and outlined expectations and action that would be taken as a result of probationary

period.  At the conclusion of three months, the RRC would decide whether to remove Dalton

from probationary status, extend her probation on a month to month basis, or dismiss her from

the program.  Dalton appeared before the RRC on January 7, 2009, in order to discuss her

probation.  (Id. at ¶ 14).  After considering Dalton's comments, the RRC unanimously decided to

continue her academic probation and made recommendations to assist her in improving her

performance.

In addition, in or around March of 2009, Dalton filed an ethics complaint in which she

apparently claimed that Blonski and Andrews did not follow policy and procedure when they

placed her on probation.  (Dalton Aff., at ¶ 71).  The "AHC" met with Dalton to discuss her

complaint on March 10, 2009.[8]  Dalton has not offered any other evidence in connection with

this ethics complaint, and there is no evidence that Dalton claimed that she was being

discriminated against in this complaint.  According to Dalton, the University "made every

attempt" to negatively document her performance after this meeting.  Dalton asserts in her

affidavit that when she informed Dr. Andrews that she intended to appeal, he told her that she

would be formally dismissed from the program.  (Id. at ¶ 75).

Dalton again appeared before the RRC on April 8, 2009, to discuss her performance and

her probation, but the RRC nevertheless concluded that her performance had not improved.

---

[8]  Dalton does not specifically explain what "AHC" refers to.

(Andrews Aff., at ¶ 16).  Consequently, the RRC voted unanimously to dismiss Dalton from the

program effective July 1, 2009, which was communicated to Dalton in a letter dated April 9,

2009 stating, in relevant part, as follows:

> "You stated you have been on probation since December, 2008
> which has caused great anxiety.  You also identified several issues
> which you have continued to work on including communications
> problems often due to lack of self confidence and assertiveness;
> anxiety in caring for patients; the documentation of information;
> frequent interruptions of other people; and inability to work with
> large groups where you are often easily distracted.  In particular,
> you repeated on several occasions your tremendous anxiety in
> caring for patients and in coming back into the residency training
> program in the Department of Pediatrics at the University of
> Minnesota Medical School after taking an away elective (in St.
> Cloud).  You recognize that you are not a 'good fit' with the
> residency program and that you might be better fit with a smaller
> program in pediatrics or a family medicine program. * * * Several
> individuals commented that you do better in an outpatient or
> ambulatory setting where you communicate much better.
> Difficulties have continued in an inpatient setting including your
> lack of organization, lack of attention to detail, and difficulty with
> synthesis of information, prioritization of problems, and
> implementation of plans."

(Id. at Exh. C).

According to Andrews, when a resident is dismissed from a residency program for

academic reasons, it is standard practice for the University to enter into discussions with the

resident regarding options that will minimize the negative impact of the dismissal on the

resident's future opportunities.  (Id. at ¶ 17).  Consequent with this general policy, Andrews

presented Dalton with a proposed severance agreement shortly after she was notified of the

RRC's decision.  The proposed agreement provided as follows: 1) Dalton would resign from the

program rather than be dismissed, 2) the parties would agree upon what the program would say

in response to inquiries regarding Dalton, 3) the program would provide Dalton with a neutral

letter of reference, including a list of rotations completed, and 4) Dalton would execute a general waiver and release of claims. (Id. at ¶ 18). Andrews recommended that Dalton contact the University's Ombudsman regarding the proposed severance agreement.

On May 4, 2009, Dalton submitted her resignation from the program effective June 30, 2009, without executing a severance agreement. (Id. at ¶ 19). In her letter of resignation, Dalton stated, "I found the environment to be too hostile, from the time I requested to change my continuity clinic preceptor from HCMC on August 19th, 2008. I was not able to perform to my full potential as a [sic] intern in this environment." (Id. at Exh. D). On May 11, 2009, the University accepted Dalton's resignation. (Id. at Exh. E).

In a separate letter, Dr. Andrews sought additional information regarding statements Dalton made in her letter of resignation:

> "In that letter, you indicated that you 'found the environment to be too hostile' in the Program. I have asked you about the statement. However, you have not provided additional information.
>
> Please be advised that the University does not tolerate harassment or discrimination in its educational programs. If you believe you have been subjected to harassment or discrimination during your participation in the Program, I encourage you to file a complaint."

(Id. at Exh. F). Andrews advised Dalton that if she wished to file a discrimination complaint, she could direct the complaint to him, or she could file a complaint with the University's EthicsPoint reporting system, the Office of Student Conflict Resolution, or the Office of Equal Opportunity and Affirmative Action.

At the end of every program year, the RRC reviews the performance of each resident, in order to determine which residents have successfully completed the training for the year and are eligible to move on to the next year of the program. (Id. at ¶ 21). For those leaving the program,

16

the RRC determines how much credit the resident should receive for the work they completed. The RRC determined that Dalton had successfully completed 9.5 months of the residency training; she did not receive credit for rotations that she did not successfully complete.

On May 14, 2009, Dalton filed a charge against Defendants with the Minnesota Department of Human Rights (MDHR) alleging discrimination on the basis of race and national origin. (Benrud Aff., Dkt. 35, Exh. C). The charge was cross-filed with the Equal Employment Opportunity Commission on May 27, 2009. In her complaint, Dalton alleged that she was treated differently than white, American-born residents, which included being assigned more on-call shifts, being required to come to morning rounds while white/American residents were not similarly required, and receiving less favorable scheduling with respect to vacation and rotations while a resident in the St. Cloud Residency Program. Dalton also alleged that Blonski retaliated against her for her complaints of discrimination by telling her that he would not be willing to promote her to the next level of residency. She then claims that she was forced to "scramble" to find another residency program. With respect to the pediatrics program, Dalton alleged that she was discriminated against based on her race and national origin because her request for a mentor reassignment was treated less favorably than requests by white/American-born residents, because she was subject to harsher criticism and scrutiny as a result of her race/national origin, and that she was retaliated against for opposing discrimination. She also claims that she was forced to resign due to the hostile working environment.

## II.     DISCUSSION

### A.     Motion to Continue

As a threshold matter, Dalton seeks a continuance of discovery so that she can appear for her previously noted deposition (which she initially failed to attend) and so that she can respond to written discovery, which was not timely completed during the original discovery period.

By way of background, a Scheduling Order governing the progression of this case was issued on August 20, 2010, which set April 1, 2011 as the discovery deadline, May 1, 2011 as the nondispositive motion deadline, June 1, 2011 as the dispositive motion deadline, and September 1, 2011 as the ready for trial date.

Dalton was initially represented by P. Chinedu Nwaneri, Esq., but on August 27, 2010, Gregg Corwin and Cristina Parra Herrera of Gregg M. Corwin & Associates Law Office, were substituted as counsel for Dalton. (Dkts. 13, 14). Then, on February 10, 2011, Gregg M. Corwin & Associates Law Office filed a motion to withdraw without substitution from its representation of Dalton, claiming that she had failed to respond to numerous attempts to communicate regarding her case. The hearing on the motion to withdraw was scheduled for March 9, 2011, but it was ultimately cancelled after a substitution of counsel was filed by Villaume & Schiek, P.A. on March 8, 2011.

Less than one month later, on March 31, 2011, Dalton's current counsel, Villaume & Schiek, P.A., filed a motion seeking leave to withdraw without substitution as counsel for Dalton. The firm asserted that Dalton had failed to respond to numerous communications regarding upcoming deadlines in her case, and that she had failed to execute a retainer agreement or release of information so that the firm could obtain the case file. While the second motion to withdraw was pending, Defendants filed a motion for summary judgment and for default

18

judgment.  Given the stage of the litigation and the pending motion for summary judgment, the Court denied the motion to withdraw of Villaume & Schiek, P.A. on April 26, 2011.  (Dkt. 45).

On February 9, 2011, Defendants had served written discovery requests upon Dalton through her former attorney, Gregg Corwin.  At the same time, Defendants also served a Notice of Deposition, which set Dalton's deposition for March 31, 2011, in Minneapolis, Minnesota. Dalton did <u>not</u> appear for her deposition on March 31, 2011, and she did <u>not</u> respond to written discovery.  Counsel for Defendants was not previously advised that Dalton would be unable to attend her deposition.[9]

Dalton now moves for a continuance of discovery.  However, the discovery deadline expired on April 1, 2011, and the motion for a continuance was not filed until May 19, 2011.  As such, Dalton's motion essentially asks the Court to actually reopen discovery.  Dalton also requests that all proceedings, including Defendants' Motion for Summary Judgment, be continued until discovery can be completed.  Dalton claims that her failure to respond to discovery within the confines of the existing Scheduling Order should be excused because she was experiencing pregnancy complications during the relevant time period.

Dalton currently resides in Princeton, New Jersey.  She had a child via cesarean section on May 11, 2011, and her doctor directed her thereafter not to travel until after June 22, 2011.  In addition, Dalton represents that she has not travelled since November 2010, due to multiple complications with her pregnancy, noting that "she was admitted multiple times for hyper emesis

---

[9]   The Court does not find Dalton's claim that she communicated her inability to travel to her former attorney, Gregg Corwin, to be credible, given her demonstrated failure to communicate with two separate attorneys over a period of several months.  The Court finds that Dalton simply ignored this litigation for several months.

and was on home IV infusion." In a May 16 letter, Dalton's physician states that she was unable to travel between February and March due to low iron, fatigue, and anemia.

Pursuant to Local Rule 16.3, "[e]xcept in extraordinary circumstances, the motion for extension [of the discovery schedule] shall be served and the hearing, if any, shall be scheduled prior to the expiration of the original pre-trial schedule deadlines." See also Fed. R. Civ. Pro. 16(b)(4). Moreover, in denying Villaume and Sheik's motion to withdraw from representation of Dalton in this case, the Court stated that "Plaintiff is specifically forewarned that the Court **will not** be moving the hearing date on Defendants' Motion for Summary Judgment, nor will it extend other existing deadlines simply because she desires or again waits to the eleventh hour to find substitute counsel."

The Court finds that Dalton has failed to establish good cause for the requested reopening and modification of the Scheduling Order. As previously noted, Dalton is not asking just to extend deadlines. Rather, she waited until well over a month after the discovery deadline had entirely expired in order to seek to reopen discovery anew.

While the Court recognizes that Dalton claims she was experiencing complications with her pregnancy during the relevant time period, her failure to do anything whatsoever in response to her discovery obligations cannot be excused on this basis. Significantly, Dalton has failed to explain why she could not have sought the extension prior to the expiration of discovery, nor has she explained why her inability to travel rendered her incapable of at leatest responding to written discovery. Dalton's health issues do not excuse her complete failure to communicate with the Court, her attorney, and opposing counsel regarding her inability to travel and her need for an extension. Had Dalton effectively and diligently communicated with counsel, the schedule could

have been adjusted in an orderly and timely manner.  However, the record in this case establishes

that Dalton wholly and completely failed to communicate with her previous attorney and her

current attorney regarding her ongoing obligations in this litigation.  See Metro Produce

Distributors, Inc. v. City of Minneapolis, 473 F.Supp.2d 955, 964 (D.Minn. 2007)("Good cause

requires the party seeking the extension to show diligence in attempting to comply with the

schedule.")  Moreover, turning back the clock at this late stage would impose significant

prejudice on the Defendants, in the form of additional costs and further delay.  Defendants

complied with the scheduling order and attempted to obtain their desired discovery in a timely

manner, and they filed their dispositive motion in a timely compliance with the Scheduling Order

without the benefit of the discovery they had requested.  Defendants would essentially have to

start the defense of this entire case over by conducting renewed discovery and then re-filing their

motion for summary judgment.  Because Dalton has failed to show that she acted diligently, her

motion for a continuance will be denied in its entirety.[10]

**B.      Sanctions**

Defendants argue that Dalton's claims should be dismissed with prejudice as a sanction

for her failure to participate in discovery.  The Court agrees.

---

[10]   Dalton argues that Defendants' motion for summary judgment should be denied as untimely because the Scheduling Order required all dispositive motions to be filed and heard by June 1, 2011.  Notably, Defendants' motion (filed on April 7, 2011) was originally set for hearing on May 27, 2011.  On April 14, 2011, District Judge Richard H. Kyle referred the Defendants' motion to the undersigned, and on April 21, 2011, an order was issued rescheduling the hearing for June 9, 2011.  The Defendants' motion was originally scheduled prior to the applicable deadline, and the hearing date was moved by the Court.  Accordingly, the Court will not penalize Defendants, who acted diligently in filing and scheduling their motion, for circumstances they could not control.

"Federal Rule of Civil Procedure 37(d) allows the district court to, among other sanctions, dismiss an action if a party 'fails to appear' for his or her deposition" or "fails to serve its answers, objections, or written response" to the opposing party's written discovery.  Aziz v. Wright, 34 F.3d 587, 589 (8th Cir. 1994)[citation omitted], cert. denied, 514 U.S. 1090 (1995); Fed. R. Civ. Pro. 37(d)(1)(A). "[N]o motion to compel is required before dismissal under Rule 37(d)."  Id., citing Halas v. Consumer Services Inc., 16 F.3d 161, 164 (7th Cir. 1994); Hale v. Burton, 2011 WL 1660216 at *2 (E.D.Mo. May 3, 2011) (dismissal is an appropriate sanction under Rule 37(d), and a motion to compel is not a prerequisite to dismissal under that provision).

Rule 37 "grants a district court wide discretion to impose sanctions for a party's failure to comply with discovery requests."  United States v. Big D Enterprises, Inc., 184 F.3d 924, 936 (8th Cir. 1999), cert. denied, 529 U.S. 1018 (2000).  However, the sanction of dismissal is more closely scrutinized due to its severity, and "fairness requires a court to consider whether a lesser sanction is available or appropriate."  Keefer v. Provident Life and Accident Ins. Co., 238 F.3d 937, 941 (8th Cir. 2000).

Dalton argues that such a severe sanction is not warranted because her failure to comply with discovery was due to complications with her pregnancy.  However, the Court has already concluded that Dalton's wholesale discovery abuses were not justified by her pregnancy complications, in light of her complete failure to respond to written discovery, and in light of her unilateral failure to appear for her properly noticed deposition without any attempt to communicate her inability to travel in a timely manner.  The record clearly demonstrates that during the relevant time period, Dalton was not communicating with her counsel and she was not taking no reasonable efforts whatsoever to participate in discovery.  Dalton has offered no explanation for her failure to respond to written discovery, which presumably could have been

completed even if Dalton could not travel, and as Defendants have noted, had they been apprised of her travel restrictions and availability, other arrangements could have been made for the taking of her deposition.  If such accommodations could not be made, a modification of the schedule could have been made before the Defendants were forced to file a dispositive motion without the benefit of having Dalton's discovery responses.

While Dalton has only now belatedly indicated that she will appear for her deposition and that she will respond to written discovery, her offer simply comes too late to remedy her previous inexcusable and unwarranted discovery violations.  As the Court already discussed, to turn back the clock at this late date would cause significant delay and would cause considerable prejudice to Defendants, who have submitted their motion for summary judgment within the schedule prescribed by the Court.  Most importantly, the Court does not believe that a lesser sanction would be effective under the circumstances of this case, since all of the available alternatives would leave Dalton completely unable to prove her claims or would cause significant prejudice to Defendants.  See Hunt v. City of Minneapolis, 203 F.3d 524, 528-29 (8th Cir. 2000)(preventing plaintiff from introducing exhibits or testimony based upon his discovery abuses would leave him "totally unable to prove his claims"; as such, "the district court was left with no practical alternative but to dismiss the case with prejudice."); Rodgers v. Curators of University of Missouri, 135 F.3d 1216, 1222 (8th Cir. 1998)(affirming dismissal where "any lesser sanction would have involved further delay or forced appellees to try their case without completing discovery.")[11]

---

[11]   In the alternative, Defendants argue that the Court should simply disregard Dalton's affidavit, arguing that she "should not be allowed to ignore the discovery rules, and then avoid summary judgment by submitting a self-serving affidavit after the fact."  The Court notes that it would be particularly unfair to permit Dalton to now defeat summary judgment in such a manner.  Here,

While it is unfortunate that Dalton was going through a difficult pregnancy during a critical period in her case, the record is simply devoid of any demonstration that she made adequate and diligent efforts to seek accommodations in a timely manner.   Rather, the record establishes that she ignored the entire process, including her attorneys, until she was confronted with the prospect of dismissal.   Therefore, the Court recommends that Dalton's claims be dismissed with prejudice as a sanction for her discovery violations.

**C.      The Merits of Dalton's Claims**

**1.      Standard of Review**

Summary judgment is appropriate only when the evidence demonstrates that there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. Pro. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006). A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence

---

Dalton submits her untested testimony in an affidavit, even though she has failed, without proper justification, to appear for her deposition or respond to written discovery.  As such, the Court concludes that striking her affidavit would also be an appropriate alternative sanction, which would essentially have the same impact as an outright dismissal in any event, since Dalton clearly has no other evidence to support her claims.  The Court notes that portions of Dalton's affidavit contain statements of conclusion, statements that are not based on personal knowledge, hearsay statements, and information that is generally irrelevant.  However, as the Court discusses herein, even if the Court considers the relevant and admissible portions of her affidavit, Dalton's claims still would not survive summary judgment on the present record.

must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Mirax Chemical Products Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).  The nonmoving party may not rest on mere allegations or denials in its pleadings but must set forth specific evidence-based facts showing the existence of a genuine issue for trial.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at  322.  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Fed. R. Civ. P. 56(c)(4) requires that affidavits supporting or opposing motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  "Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge."  El Deeb v. University of Minnesota, 60 F.3d 423, 428-29 (8th Cir. 1995)[citing cases].  While a judge is not to weigh the evidence to determine truth at the summary judgment stage, "a properly supported motion for summary judgment is not defeated by self-serving affidavits."  Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006).  "Eighth Circuit law is clear that a naked self-serving affidavit, by itself, in the absence of any evidence in the record, is insufficient to create a genuine issue of material fact in dispute and accordingly is insufficient to defeat a motion for summary judgment."  Harju v. Comrie, 2007 WL 1847248, at *6-7 (D.Minn. June 25, 2007)(naked assertions that simply

reiterated allegations of the complaint, without any support in the record, did not create a genuine issue of material fact).

### 2.    Discussion

Defendants have also sought dismissal on the merits.  The Court finds that even if it considers the limited relevant and admissible portions of Dalton's affidavit, she has still failed to raise any genuine issue of material fact that would preclude summary judgment on any of her claims.

### a)    Timeliness of Title VII claims

Defendants first argue that Dalton's Title VII claims challenging discrimination in the St. Cloud Residency Program must be dismissed as untimely.

Under Title VII, an administrative charge must be filed within 180 days of the incident giving rise to the claims, or within 300 days if the matter is initially raised with a state agency. Shempert v. Hardwick Chemical Corp., 151 F.3d 793, 796 (8th Cir. 1998), cert. denied, 525 U.S. 1139 (1999)(citing 42 U.S.C. 2000e-5(e)(1)).  Dalton filed her claims with the MDHR on May 14, 2009, which means that the incidents giving rise to her claims must have occurred on or before July 18, 2008 (i.e., 300 days prior to the date of the MDHR filing).  There is no dispute that Plaintiff was no longer participating in the St. Cloud Residency Program on or after June 16, 2008, which means that Plaintiff did not file her administrative charge within 300 days of leaving the program.

Dalton contends that the conduct falling outside the 300-day statutory period is part of a continuing violation that extended to the Pediatrics Residency Program, and therefore, that her

claims regarding the St. Cloud Residency Program are not time-barred. "Conduct which occurred more than 300 days before the date of filing cannot be grounds for a suit unless it is part of a continuing violation which is systemic or serial." <u>Klein v. McGown</u>, 198 F.3d 705, 709 (8th Cir. 1999)(citing <u>Kimzey v. Wal-Mart Stores, Inc.</u>, 107 F.3d 568, 575-73 (8th Cir. 1997)). To avail herself of this exception, Dalton must demonstrate that some incident of discrimination occurred within the 300 day limitations period, and that there is a sufficient nexus between that incident and the other instances of discrimination. <u>Klein</u>, 198 F.3d at 709. However, discrete discriminatory acts, such as decisions to hire or fire someone, are not actionable if they are not challenged within the statute of limitations, even if they are "related to acts alleged in the timely filed charges." <u>Saulsberry v. St. Mary's University of Minnesota</u>, 318 F.3d 862, 866 (8th Cir. 2003).

Dalton argues that she has established a nexus between her treatment in the two residency programs, because Blonski's communications with Andrews and others set the stage for a hostile work environment in the Pediatrics Residency Program. However, the Court finds that Dalton has not established a sufficient nexus between the programs in order to bring her Title VII claim, as it relates to the St. Cloud Residency Program, within the "continuing violation" exception to the statute of limitations.

First, the fact that the University runs both programs is not, by itself, sufficient to establish a nexus between the alleged discrimination in the two programs. Dalton had to resign from the St. Cloud program in order to start the pediatrics program, and there is <u>no</u> evidence that her probationary status in the St. Cloud program carried over to the pediatrics program. Most importantly, there is no admissible evidence to establish that Blonski, or anyone else from the St. Cloud program, caused or encouraged a hostile work environment for Dalton within the

pediatrics program, and there is no admissible evidence that Andrews or others within the pediatrics program were influenced by individuals or circumstances occurring at the St. Cloud program.  Indeed, there is no competent evidence that anyone in the pediatrics program new about Dalton's prior performance, the difficulties she experienced while in the St. Cloud program, or her complaints of discrimination.

Dalton argues that the Court may infer from the "amount of communication" between Blonski and Andrews, that Blonski "influenced the management of the Pediatrics Residency Program to retaliate against the Plaintiff."  The Court finds this argument to be without merit.  There is no evidence that Blonski made any negative comments about Dalton when he spoke with Andrews, and consequently, Dalton has only established that Blonski had the **opportunity** to make negative comments about her.  Dalton's argument does not ask the Court to make a reasonable inference; rather, it asks the Court to speculate as to what might have occurred.

Accordingly, insofar as Dalton asserts a Title VII claim for discrimination in the St. Cloud Residency program, her claim should be dismissed as untimely.

### b)      Sovereign Immunity (Section 1981 and Section 1983)

Next, Defendants argue that Dalton's claims under Section 1981 and Section 1983 are barred by the Eleventh Amendment insofar as they relate to the University.

The Eleventh Amendment prohibits an action for damages against a state unless it has unequivocally consented to suit or Congress has abrogated the states' immunity for a particular federal cause of action.  Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996)[citations omitted], cert. denied, 519 U.S. 1148 (1997); Faibisch v. University of Minnesota, 304 F.3d 797, 800 (8th Cir. 2002).  States are entitled to Eleventh

Amendment immunity for claims brought under both Section 1983 and Section 1981.  <u>Singletary v. Missouri Department of Corrections</u>, 423 F.3d 886, 890 (8th Cir. 2005)(states are immunized from claims for damages under Section 1981); <u>Hadley</u>, 76 F.3d at 1438 ("Section 1983 does not override Eleventh Amendment immunity").  The Eighth Circuit has already determined "that the University of Minnesota is an instrumentality of the state and entitled to share in the state's Eleventh Amendment immunity."  <u>Trevelen v. University of Minnesota</u>, 73 F.3d 816, 818 (8th Cir. 1996)[citing cases]; <u>Hoeffner v. University of Minnesota</u>, 948 F.Supp. 1380, 1385 (D.Minn. 1996)("our Court of Appeals has consistently found the University to be an instrumentality of the State of Minnesota for Eleventh Amendment purposes.")[collecting cases]; <u>Teachout v. University of Minnesota</u>, 2011 WL 916356 at *5 (D.Minn. Mar. 16, 2011)("The immunity afforded a state in federal court extends to the University of Minnesota.")

Dalton argues that her Section 1981 and Section 1983 claims against the University are not subject to Eleventh Amendment immunity because the University's conduct was intentional.  However, she has cited no authority for the proposition that intentional conduct overrides Eleventh Amendment immunity.  As such, to the extent that Dalton seeks damages from the University for violations of Sections 1981 and 1983, her claims are barred by the Eleventh Amendment.

### c)      Section 1983 Claim against CentraCare

Defendants next argue that Dalton cannot maintain a claim against CentraCare for violations of Section 1983 because CentraCare was not acting under the color of state law.

In order to maintain a claim under Section 1983, a plaintiff must establish that the defendant deprived the plaintiff of a constitutionally protected federal right under the color of

state law.  Van Zee v. Hanson, 630 F.3d 1126, 1128 (8th Cir. 2011).  The plaintiff bears the burden of proving that a private defendant acted under color of state law.  Armstrong v. Fairmont Community Hospital Ass'n, Inc., 684 F.Supp. 1486, 1489 (D.Minn. 1987)(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)).  "Before the action in question can be characterized as 'state action,' there must be a 'sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."  Id. at 1489-90 (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974)).

Dalton argues that "there is substantial evidence that CentraCare acted under color of state law because they are prohibited from discriminating against individual [sic] based on that person's race or national origin pursuant to the MHRA."  This argument clearly misconstrues the "color of state law" prong, since the mere fact that a state discrimination law applies to an entity has no bearing on whether Section a 1983 can be asserted against that entity.  See e.g, Jackson, 419 U.S. at 350 ("the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.")

Here, all that can be discerned from the record is that CentraCare provided the site for the St. Cloud Residency Program.  This is clearly insufficient to establish that any of CentraCare's conduct was essentially action by the State or University itself.  Dalton has failed to produce any other evidence tending to show that CentraCare, which is a private, non-profit health organization, was acting under the color of state law at the time of the conduct in question.  See Lindstedt v. Missouri Libertarian Party, 160 F.3d 1197, 1198 (8th Cir. 1998)(affirming summary judgment on Section 1983 claims where plaintiff did not point to any facts showing the defendant was acting under the color of state law), cert. denied, 528 U.S. 850 (1999).  Dalton has

failed to carry her burden of establishing a close nexus between the State and CentraCare. Accordingly, her Section 1983 claim against CentraCare should be dismissed.

### d)      Discrimination Claims

Dalton asserts claims for intentional discrimination under several different laws: 1) Title VII, which prohibits employment discrimination, 2) Title VI, which prohibits discrimination in programs or services that receive federal funding, 3) 42 U.S.C. § 1981, which prohibits discrimination with respect to contracts, 4) 42 U.S.C. § 1983, which prohibits discrimination committed under the color of state law, and 5) the MHRA, which also prohibits employment discrimination.  Regardless of the legal basis for her discrimination claims, however, they are all analyzed under the same framework.  See Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1997)(claims brought under Title VII, Section 1981, and Section 1983 are analyzed under the same framework); Saulsberry v. St. Mary's University of Minnesota, 318 F.3d at 866 ("the elements of a MHRA, Title VII, and § 1981 discrimination claims are the same."); Richmond v. Board of Regents of University of Minnesota, 957 F.2d 595, 598 (8th Cir. 1992)("To meet her burden of showing a prima facie case of discrimination under Title VII, section 1981, [and] section 1983," the plaintiff must meet the same standard); Fuller v. Rayburn, 161 F.3d 516, 518 (8th Cir. 1998)(the same standard applies to claims brought under both Title VI and Title VII). Accordingly, the Court will address all of Dalton's discrimination claims together.

Here, Dalton does not contend that there is direct evidence of discrimination, and the Court's review of the record establishes that Dalton has not produced direct evidence of

discrimination.[12]   Accordingly, the three-stage, burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies.  Under this framework, Dalton bears the initial burden of establishing a prima facie case of discrimination.  Cronquist v. City of Minneapolis, 237 F.3d 920, 924 (8th Cir. 2001).  To meet this burden, a plaintiff must show 1) that she belongs to a protected class, 2) that she is qualified for the position or was meeting the legitimate job expectations, 3) that she suffered adverse employment action, and 4) that similarly situated employees outside the protected class were treated differently.  Fields v. Shelter Mutual Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008).  Once a prima facie case is established, a rebuttable presumption shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for discharging the employee.  Cronquist, 237 F.3d at 924.  If the employer articulates such a reason, the presumption disappears and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discrimination.  Id.

For purposes of the present Motion, Defendants have assumed that Dalton can establish a prima facie case of discrimination.  Instead, Defendants argue that the undisputed facts show that they had legitimate, non-discriminatory reasons for all of their decisions with respect to Dalton's employment and residency, and they further argue that Dalton cannot establish that their reasons were pretext for discrimination.  As such, the Court has assumed, without deciding, that Dalton can make out a prima facie case of discrimination.

---

[12]   Direct evidence of intentional discrimination is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact find that an illegitimate criterion actually motivated the adverse employment action."  Russell v. City of Kansas City, Mo., 414 F.3d 863, 866 (8th Cir. 2005)[citation omitted].  "It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias."  McCullough v. University of Arkansas, 559 F.3d 855, 861 (8th Cir. 2009).

The Court will first address Dalton's allegations regarding the St. Cloud Residency Program.[13]  The evidence shows that Defendants placed Dalton on a learning plan and academic probation because the program received ongoing complaints regarding her performance, and because she was not meeting the expectations of a first year resident.  The Court concludes that the Defendants have met their non-onerous burden of articulating a legitimate, nondiscriminatory reason for taking adverse action against Dalton.  See Montes v. Greater Twin Cities Youth Symphonies, 540 F.3d 852, 858 (8th Cir. 2008)(employer's burden at this stage is "non-onerous")(citing Pope v. ESA Services, Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)).

Having reviewed the evidence, the Court finds that Dalton has failed to establish that Defendants' legitimate reasons for placing her on academic probation or for placing her on a learning plan were pretextual.  There is simply no evidence in the record to support the claim that Defendants took adverse employment action against Dalton **because of** animus based on race or national origin.  While Dalton complained that she believed she was being treated differently because of her status as an IMG, there is nothing besides her own allegations to support this claim.

The Court recognizes that Dalton claims that she received unequal treatment with respect to the scheduling of vacation and call shifts.  Blonski disputes that Dalton received unequal treatment in these respects.  "Instances of disparate treatment can support a claim of pretext," but the plaintiff retains the burden of proving that the disparately treated employees were "'similarly

---

[13]   For reasons already discussed, the Court has treated the St. Cloud Residency Program and the Pediatrics Residency Program as entirely independent and separate claims.  Although both programs are run by the same University, the programs were in different cities, at different hospitals, with different faculty and staff.  Dalton was required to apply for and be accepted to the Pediatrics Residency Program through a separate application process, and she was also required to resign from her contract with the St. Cloud Residency Program before starting the pediatrics program.

situated in all relevant respects"' other than race or national origin.  Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994)(quoting Jones v. Frank, 973 F.2d 673, 676 (8th Cir. 1992)); See Rose-Maston v. NME Hospitals, Inc., 133 F.3d 1104, 1109 n. 4 (8th Cir. 1998)("it was [plaintiff's] burden to produce specific, tangible evidence showing a disparity in the treatment of similarly situated employees").  The test for whether employees are similarly situated to warrant a comparison to the plaintiff is "rigorous."  Harvey, 38 F.3d at 972.  Dalton has presented no evidence to establish that she was similarly situated in all relevant respects in the consideration of vacation or the scheduling of shifts, nor has she shown that any of the individuals who were involved in the scheduling of call shifts or vacation were ever involved in the decisions to place her on a learning plan or to place her on academic probation.  See Russell v. Men's Wearhouse, Inc., 170 F.3d 1156, 1157 (8th Cir. 1999)(plaintiff had failed to show that defendant's proffered nondiscriminatory reason for employment decisions was pretextual, noting that "[t]he record shows that Russell, although a good salesman, had interpersonal difficulties with co-workers and management"); Rose-Maston, 133 F.3d at 1108 (plaintiff "may prove pretext either directly by showing that her employer was more likely motivated by a discriminatory reason or indirectly by showing that her employer's explanation is unworthy of credence."); Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006)("To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reasons for terminating the plaintiff was her race.")  Her conclusory affidavit claiming that she was treated differently is insufficient to create a genuine issue of material fact on the issue of pretext.   See Rose-Maston, 133 F.3d at 1109 ("Conclusory affidavits, standing alone, cannot create a genuine issue of material fact precluding summary judgment).  Dalton has not offered any competent

evidence to discredit Defendants' proffered reasons for placing her on academic probation, nor has she shown any evidence of differential treatment or discriminatory animus.

In sum, Dalton has failed to produce sufficient evidence to allow a reasonable juror to conclude that her race or national origin were the motivating factor behind the St. Cloud Residency Program's employment decisions.

Turning to the Pediatrics Residency Program, Dalton argues that the pediatrics program also treated her differently based on her race and national origin, and she further claims that the University's reasons for placing her on academic probation and dismissing her from the program were pretext for discrimination. However, Dalton has failed to bring forth any evidence in support of this claim that would support a reasonable inference that such discrimination in fact occurred.

The University has established that it had valid, nondiscriminatory reasons for putting her on probation and for dismissing her from the pediatrics program based on her deficient performance and lack of improvement. The RRC discussed Dalton's performance on numerous occasions, allowed her to appear before the committee, gave her feedback and advice on how to improve, and concluded after a period of several months that Dalton's performance remained deficient. Dalton has not brought forth any evidence that might tend to show that the RRC's actions and decisions are not worthy of credence.

Most importantly, there is simply no evidence that any of the University's actions were pretext for discrimination based on race or national origin. Simply put, there is no evidence that **anybody** in the Pediatrics Program harbored discriminatory intent or animus towards Dalton. Moreover, Dalton has failed to show that she was treated differently than other similarly situated

white/American residents in any meaningful way, such that a reasonable inference of discrimination could be made. Dalton claims that a similarly situated resident was permitted to skip orientation. However, Dalton has not offered any evidence to show that she was similarly situated to this individual, and moreover, she was given the choice to skip orientation, although she decided against it. Dalton further claims that her request for a new advisor was not granted for several months, while another white/American resident's request was "promptly" granted. Again, however, Dalton has not offered any evidence to show that this other unnamed resident was in a similarly situated position – all the Court can discern is that another request for reassignment was apparently handled in a more timely fashion. See E.E.O.C. v. Kohler Co., 335 F.3d 766, 775-76 (8th Cir. 2003)("Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects . . . Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct with any mitigating or distinguishing circumstances."); Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003)(comparator "was not similarly situated because his discipline was not administered by the same supervisors who administered [plaintiff's] discipline), cert. denied, 540 U.S. 955 (2003). Simply put, disparate treatment standing alone, without any evidence that the individuals were in similarly situated circumstances, is not sufficient to support a claim of pretext. Furthermore, there is absolutely nothing in the record connecting these isolated incidents of allegedly differential treatment to the decision to place her on probation and dismiss her from the program. Therefore, the Court finds that Dalton has failed to create a reasonable inference that she was discriminated against based on her race/national origin as a resident in the Pediatrics Residency Program.

In sum, Dalton has failed to raise a genuine issue of material fact on her intentional discrimination claims, and accordingly, Defendants are entitled to summary judgment on these claims.

### e)       **Retaliation Claims**

Dalton also claims that Defendants retaliated against her for reporting discrimination in violation of Title VII, Section 1981, Section 1983, and the MHRA.

It is unlawful for an employer to retaliate against an employee because she has opposed unlawful discrimination by the employer.  Twymon, 462 F.3d at 936.  In order to establish a prima facie case of retaliation, the plaintiff "must show 'that he engaged in protected conduct, that he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct.'"  Putman v. Unity Health System, 348 F.3d 732, 737 (8th Cir. 2003)(quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)).  After an employer establishes a legitimate, nondiscriminatory reason for its conduct, a plaintiff must also show that the defendant's reasons were pretextual, and that the real reason for the action was retaliation for protected conduct.  Id.  Moreover, as long as the plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination, the success or failure of a retaliation claim is not tied to the merits of the underlying discrimination claim.  Foster v. Time Warner Entertainment Co., L.P., 250 F.3d 1189, 1195 (8th Cir. 2001).

Again, the Court begins with the St. Cloud Residency Program.  Defendants contend that Dalton's performance problems were ongoing and well established, and that all of the actions taken were based on legitimate, nondiscriminatory, and performance-based reasons.  Therefore, they contend that their decisions were clearly not motivated by retaliation.  Dalton contends that

after she complained of discrimination on numerous occasions, the Defendants retaliated against her.[14]

The undisputed facts establish that Dalton reported discrimination to the Program Director for the St. Cloud Residency Program. In response, Blonski asked Dalton to provide more information about the differential treatment she felt was occurring in the program, and he solicited an outside team from the University to investigate the charges. Although the team found numerous problems with the program as it related to Dalton's resident class, the team concluded that there was no evidence of discrimination.[15] The Court recognizes that she was placed on a remedial plan, and later on academic probation, not long after she reported discrimination, but the timing of adverse action, by itself, is insufficient to establish that Defendants acted out of retaliation. Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000)("timing on its own is usually not sufficient to show that an employer's non-discriminatory reason for discharge is merely pretext" for retaliatory intent); Nelson v. J.C. Penney Co., Inc., 75 F.3d 343, 346 (8th Cir. 1996)("In light of all of these circumstances, we cannot agree with the trial court that the mere coincidence of timing established a submissible case of retaliatory discharge.") Here, Dalton has failed to make any causal connection between the SSC's decision and her complaints of discrimination, aside from their timing.

---

[14]   The Court notes that Dalton makes much of the fact that she was required to resign from the St. Cloud Program Residency Program in order to start the Pediatrics Program on time. However, the record is clear that Dalton could not participate in two programs at one time, so regardless of whether her early resignation had any negative consequences, she could not begin the Pediatrics Program without resigning her position. As such, the Court concludes that Dalton has not created a reasonable inference that she was forced to resign without cause.

[15]   Dalton argues that it may be inferred that the investigation team found evidence of discrimination, because the report merely stated that the team found no evidence of **overt** discrimination. The Court disagrees. Such an argument reads far more into this statement than is reasonable.

Next, the Court addresses her claims of retaliation in the Pediatrics Residency Program. The Court finds that Dalton's retaliation claim as it relates to the Pediatrics Residency Program fails because she cannot establish that she engaged in protected conduct for which she could have been subjected to retaliation, and because she cannot show that the program's reasons for dismissing her from the program were pretextual.

Dalton implies that she engaged in statutorily-protected conduct when she filed the ethics point complaint in connection with the University's failure to follow policy and procedure in placing her on probation. However, Dalton does not state that she reported that she alleged racial discrimination in this complaint. Rather, Dalton only states that she filed a complaint "alleging that they did not follow procedure in disciplining her." (Dalton Aff., at ¶ 71). Reporting that an employer failed to follow policy and procedure does not qualify as protected conduct within the meaning of the applicable legal authorities. She cannot meet her burden simply by alleging that she complained about anything the employer did if the complaint is not linked to allegations of unlawful discrimination. Van Orden v. Wells Fargo Home Mortgage, Inc., 443 F.Supp.2d 1051, 1062 (S.D.Iowa 2006)("the employee's opposition to the employer's conduct must be expressed in a manner that connects it to an employment practice made unlawful by Title VII")(citing Hunt v. Nebraska Public Power District, 282 F.3d 1021, 1028 (8th Cir. 2002)("The protected activity in [plaintiff's] retaliation claim would fall generally within the opposition clause, but [plaintiff] failed to present sufficient evidence that she opposed an **unlawful** employment practice prior to her termination")[emphasis retained]). There is absolutely no evidence that Dalton ever connected her opposition to the University's failure to follow policies and procedures to allegations of discrimination. In fact, it appears that her claim of discrimination as to the Pediatrics Residency Program was first raised in her letter of resignation. If she made no claim

of discrimination until after she was dismissed from the program by the RRC, then a reasonable jury could not conclude that she was dismissed from the program as retaliation for engaging in protected conduct. Therefore, Dalton has not raised a genuine issue of material fact with respect to her retaliation claim in connection with the Pediatrics Residency Program.

In any event, even if she had engaged in statutorily protected conduct, Dalton has failed to raise a reasonable inference that she was placed on probation and dismissed from the program because of retaliation. For the reasons already discussed above, the Pediatrics Residency Program had a legitimate, non-discriminatory reason for dismissing her from the program, and Dalton has not offered any other evidence that would otherwise connect the program's decision to dismiss her to a retaliatory motive or cast serious doubt on the basis for her probation and dismissal.

The Court is cognizant that even though Dalton has not offered any evidence that she engaged in protected conduct while she was a resident in the Pediatrics Residency Program, she claims that the pediatrics program was aware of and retaliated against her for the discrimination claims that she made while she was in the St. Cloud Residency Program. This argument does not save her retaliation claim. There is no competent evidence that would create a reasonable inference that anyone in the pediatrics program was aware that Dalton complained of discrimination while she was a resident in the St. Cloud Residency Program. Andrews acknowledged that he spoke with Blonski two or three times to facilitate Dalton's transfer, but there is no evidence showing that they discussed her allegations of discrimination. Dalton also claims that Blonski communicated "substantial false and negative information" regarding Daltong to the faculty of the Pediatrics Residency Program. However, she provides no facts to support this conclusory statement: Dalton doesn't relate how she knows what Blonski told the

faculty members, we don't know what information Dalton believes Blonski actually relayed to the faculty members, and we don't know which faculty members Dalton believes Blonski was communicating with, aside from Andrews. As such, her conclusory and speculative assertion that Blonski fostered a hostile environment for Dalton in the Pediatrics Residency Program is not competently supported by any evidence in the record. See Central States Industries Supply, Inc. v. McCullough, 279 F.Supp.2d 1005, 1019 (N.D.Iowa 2003)(when considering an affidavit offered on a motion for summary judgment, the court may disregard statements of conclusion and statements "not based upon personal knowledge"). Therefore, Dalton has failed to establish any reasonable causal link between her complaints of discrimination in the St. Cloud Residency Program and any adverse action taken in the Pediatrics Residency Program.

In sum, Dalton has failed to raise a genuine issue of material fact on her retaliation claims, and therefore, Defendants are entitled to summary judgment on these claims.

## III.    RECOMMENDATION

For the foregoing reasons, and based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiff's Motion for an Extension of Time to Complete Discovery [Docket No. 50] be DENIED;

2.    Defendants' Motion for Summary Judgment and Default Judgment [Docket No. 30] be GRANTED;

3.    This action be dismissed with prejudice.


Dated: August 25, 2011                                s/Leo I. Brisbois
                                                      LEO I. BRISBOIS
                                                      United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by September 8, 2011, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.